GARRISON, Judge.
This is an appeal from a judgment of the juvenile court dated October 21, 1985, terminating parental rights and ordering a written plan for permanent placement. From that judgment, the biological and legal mother, Joan Lyons, appeals.
On August 29, 1978, Kendall and Kendrick Lyons were adjudged “neglected children” by Judge Joan Armstrong, Juvenile Court for the Parish of Orleans. The State placed the twin boys in a foster home where they have been for the past seven to eight years. The neglect hearing is not on appeal before this court.
On April 9, 1985, the State through the Parish District Attorney’s Office filed a petition for termination of parental rights, alleging that more than 5 years had elapsed since the finality of the neglect judgment; citing various physical abuses and further alleging:
“Joan Marsh Lyons is unfit to retain parental control, she has shown no significant substantial indication of reformation, and she is unlikely to reform, for the following reasons:
1). She has a long history of mental illness which includes personality disorder and alcoholism.
2) She is prone to extensive lying.
3) Her pathology and limitation are so severe that she is incapable of providing stability for her children.
VIII.
Joan Lyons is unlikely to reform.
DC.
The best interests of these children require that the parental rights be terminated to allow them to be adopted by others.”
*884 At trial, Mrs. Lyons stated[1] that at the neglect hearing the judge promised her that if she underwent treatment at the Desire Mental Health Clinic and visited with her children, these two children would be returned to her. We doubt that the juvenile court judge ever made such a “promise”. She may have told Mrs. Lyons that if Mrs. Lyons underwent treatment which was successful to the extent that Mrs. Lyons could care for her children, her children might be returned to her. What was actually said at the neglect hearing, if anything, this court will never know because Mrs. Lyons failed to introduce a transcript of the neglect hearing at which the alleged “promise” was made into evidence at the termination hearing.
Joan Lyons is a schizophrenic. When medicated, she is diagnosed as a high moderate to low severe schizophrenic. She presently is on medication. All psychiatric expert testimony agrees that she will never be cured, that she is permanently at her current level of schizophrenia and that should she stop taking her medicine she will become a severe schizophrenic. Mrs. Lyons is also an alcoholic. She states that she no longer drinks, but her confused testimony indicates that she may drink on holidays or more often. She makes contradictory statements.
She is the mother of 8 children, all of whom have been removed from her and placed in the State’s care over the years. She is currently unemployed and has been unemployed “for a year and something, or three years.” . (Tr. p. 72). She presently lives in a “3 or 4” (Tr. p. 73) bedroom house with 10 people. Her mother, age 69, does all of the cooking and all of the residents help to keep the house clean. When asked who brought in the money to run the household, she stated that one woman works, her mother receives a pension and that two other people get Welfare. Mrs. Lyons, aged 42, is unable to care for herself on a basic adult level.
Mrs. Lyons was previously convicted of negligent homicide in conjunction with a D.W.I. charge and served time in Saint Gabriel Prison.
At the time when Juvenile Judge Armstrong adjudicated the children as “neglected”, several incidents had occurred. One child had cigarette burn marks. They were living in the house without water and electricity. On one occasion, she left the children naked in the backyard.
Mrs. Lyons denies that she killed a man in the D.W.I. episode and denies that she has any problem taking care of herself or her children, although all evidence and reality is to the contrary.
The twin children have been with their foster parents since 1978, having been removed from the home at age 3 or 4. Testimony indicates that not only is there no affection exchanged between Mrs. Lyons and the boys, but also the boys are upset and afraid when they are around her. The boys still have residual memories of the abuse and neglect inflicted upon them by Mrs. Lyons and they are afraid of her.
On appeal, Mrs. Lyons raises one specification of error, namely that the trial court erred in granting the termination because the State failed to carry its burden of proof.
The trial court judge orally dictated the reasons for judgment, had them prepared in the form of written reasons for judgment including date and signature lines, but never signed them. The unsigned reasons for judgment are as follows:
*885 “IN THE INTEREST OF KENDALL LYONS and KENDRICK LYONS
ORLEANS PARISH JUVENILE COURT STATE OF LOUISIANA CASE #206-241-C
Reasons for Judgment rendered in the above-entitled and numbered cause on the 2nd day of October, 1985, before the Honorable Salvadore T. Mulé, Judge presiding.
This action to terminate parental rights was brought on via LSA-R.S. 13:1601(B)(1), which states, ‘One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment as defined in LSA-R.S. 13:1600, paragraph 7 pursuant to the Code of Juvenile Procedure, and in the opinion of the Court the parent is unfit to rear the child.’ Paragraph 2 states, ‘The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.’
LSA-R.S. 13:1603 states that under subsection (B) of R.S. 13:1601 paragraphs one and two must be proven by clear and convincing evidence. There is no question that the State has proven by a clear and convincing evidence paragraph one of subsection (B) of LSA-R.S. 13:1601. A judgment rendered in the Juvenile Court in case number 180-296-A of this Court adjudicated the children Kendall and Kendrick neglected children and five years have elapsed since the rendition of that judgment.
The next issue that the Court must address is: Has the State proven by clear and convincing evidence that the parent or parents have shown no significant substantial indication of reformation and are unlikely to reform? The allegations of the Petition must be considered. The paragraph of the Petition referring to that is number VII, which says that, ‘Joan Marsh Lyons is unfit to retain parental control, she has shown no significant substantial indication of reformation, and she is unlikely to reform, for the following reasons: 1) She has a long history of mental illness which includes personality disorder and alcoholism.’ I will come back to the long history of mental illness. Secondly it alleges that, ‘She is prone to extensive lying.’ There was not one scintilla of testimony regarding that allegation. Thirdly, ‘She was convicted of negligent homicide.’ To this day I still don’t know what that has to do with our being shown no significant substantial indication of reformation and is unlikely to reform. Had the State not put Mrs. Lyons on the stand under the act there would have been no testimony whatsoever about anything to do with negligent homicide. I still don’t know what that had to do with this case for termination of parental rights. There was nothing, no proof by the State by way of a certified copy of a judgment from the Criminal District Court that this lady was convicted. I just don’t know what it had to do with this case. I am at a total loss why allegations like that are thrown into a Petition of this nature.
Fourthly, ‘Her pathology and limitation are so severe that she is incapable of providing stability for her children.’ I suppose that has to be taken into consideration with number one of paragraph VII and also paragraph VIII, which says, ‘She is unlikely to reform.’
We heard the testimony of two witnesses, a psychologist and a psychiatrist. The psychologist examined this lady twice; once in 1983 and once in 1985, and both of those evaluations stated that the lady suffered from schizophrenia; she had poor judgment; she had an immature view of life and so forth. Dr. Jordan was pretty adamant in his opinion that this lady could not care for these children. But Dr. Jordan was not so positive in any testimony as to whether or not she had shown any significant substantial indication of reformation and unlikely to reform. He did state that the return of the children would not be in the best interest of the children. That is always a very convenient statement in Juvenile Court proceedings without looking at what is the issue before the Court. We are not necessarily concerned only with what is in the best interest of the children; we are talking about termination of the rights of the parent, not what is necessarily in the *886 best interest of the children. I like to equate these proceedings, termination of parental rights, to a judge sitting in a murder case and passing judgment, because the sentence in this, to me, is just as severe as capital punishment. I have to determine whether or not I am going to terminate a parent’s rights, a natural right granted to a parent by God, not by the State. The State has to bear the burden of proof.
Dr. Jordan’s one statement about Mrs. Lyon’s crying when she was describing the children being taken away from her only made me believe that even though the lady suffered from schizophrenia she also knew that she was a parent; and when the children were taken away said, ‘Well, that is not necessarily so, because if it had happened when the children were first removed I could account for that, but not five or six years later.’ I am not a psychologist and I am not a psychiatrist, but I just think if a person is a parent and they start talking about having their children taken away from them if they don’t show any kind of emotions I am concerned about them; and if they show some kind of emotions I think they might be normal to a certain extent.
I think that the Court has to consider the testimony of Dr. Alleyne seriously, much more so than the testimony of Dr. Jordan, who saw the lady only twice for evaluation purposes, and not for treatment purposes. Dr. Alleyne testified that she first saw Mrs. Lyons in 1982, and that she supervised the treatment thereafter. What is particularly significant is that Dr. Alleyne said that Mrs. Lyons did make some significant improvement between 1982 and 1983 when Dr. Alleyne put her on medication; that Mrs. Lyons achieved what Dr. Alleyne considered to be the height of improvement; that Mrs. Lyons is not going to go beyond that but that she did make — and the words she used was — significant improvement. She did not use the double, I suppose adjective, significant substantial indication, but she did say that there was significant improvement.
I think that both the psychologist and the psychiatrist agreed as to the degree of severity of Mrs. Lyons’ problem. I don’t know what they are talking about when they contradicted themselves, Dr. Jordan and Dr. Alleyne, but all schizophrenics are psychotic according to Dr. Alleyne. Dr. Jordan said that is not so; so let them argue about that.
When asked: What is the prognosis for change from Mrs. Lyons, Dr. Alleyne stated that with medication she is stable, but there will be no further improvement. She has achieved as far as she can go. I think something else that is relevant in Dr. Al-leyne’s testimony is that she treated Mrs. Lyons for her problem, for her mental deficiency, for the schizophrenia. She did not treat her as a parent whose children had been removed from her, and that if she improved in her parenting skills the children would be returned to her. That makes me concerned, because perhaps the reference to the Desire Mental Health Center by the Office of Human Development for Mrs. Lyons was not intended ever to have the children returned to Mrs. Lyons. And that concerns me because Dr. Alleyne could not testify as to whether this lady can care for these children. She repeatedly stated that, she would have to look at the whole record; that she couldn’t say anything about Mrs. Lyons’ ability to parent, which I find to be significant.
Another matter which is significant is the fact that the workers testified that Mrs. Lyons did everything that was expected of her. She made her visits every month; she went to the Desire Mental Health Center. That is what they told her to do. She did that. Then we find out that she has made significant improvements. I don’t know what else is required of this lady since I am not the Judge who had the neglect case. I don’t know anything about that. All I have to rule on is what is before me today. I stated earlier that the criteria in this case is not what is in the best interest of the children, and the fact that someone is ready, willing and able to adopt these children is not really one of the criteria.
*887 In looking at the testimony this is an awfully difficult case to rule upon for this reason: In balancing the scales here we have three people to consider: We have Mrs. Lyons on one hand, and we have the children on the other. If the State has not proven its case by clear and convincing evidence against Mrs. Lyons, what happens to these children? Are they harmed by the decision that the State did not prove its case? I think that in this particular case, regardless of how the Court rules on the termination, the children are the ones to suffer. They will suffer whether they are freed for adoption; they will suffer if they are returned to their mother or the termination is not granted or the children remain in foster care. I think that this is a case of — and I use the word very cautiously and advisedly — State neglect in dealing with this case for this long period of time. I say that the children are going to be harmed, because they have now bonded to these foster parents, who have become in essence their parents. I say State neglect, because as Mr. Larose point [sic] out, the mother did everything that she was required to do and yet the State made no offer for the children to visit their mother more than one hour a month, which to me is the most abnormal thing in the world; and to have the mother go to the Office to visit and sit in a room, to be watched by the workers. How can the mother and children ever have or develop any kind of parent-child relationship under those circumstances? The Court feels that the State has not proven by clear and convincing evidence that the mother under number two has shown no significant or substantial indication of reformation and is unlikely to reform. I think that the lady has shown that she has reformed to the point that Dr. Alleyne says she can reform to. I’m going to go one step further — and I know I am going to lay myself open for an appeal — but pretermit-ting the law that says that you have to prove by clear and convincing evidence, which I don’t think the State did, I am obliged to look at these children now. These children have not known this lady, Mrs. Joan Marsh Lyons, as their mother. The only people they know as their mother and father really are their foster parents. They have bonded to these people; they visit their mother only because there was a Court order, I assume, that said there should be visitation once a month. So the worker made sure that the children were brought to the Office of Human Development so that the mother could have this right of visitation for one hour a month.
To have these children remain in foster care until they are eighteen years old, and then to be let out on their own to me is injuring and harming these children. They have lived with these same foster parents for some seven or eight years. They only know these people as their parents. These people, the foster parents, are ready, willing and able to adopt these children as their own so that they could have all of the rights of natural children of these foster parents. I just reluctantly do this, but I think that pretermitting what the law says in the best interest of these children the decree of termination should be granted so that the children can be taken care of.
The State, the Office of Human Development, the Department of Health and Human Resources has committed a gross injustice to this lady. I also think that the abuse or neglect on the part of the State works towards these children. I just have a gut feeling that when these children were removed and the lady had the difficulties that she had way back then but showed some reformation later on that the State had already determined that they would terminate her rights so that these people could adopt and did nothing to work towards reuniting this family as Mr. Larose pointed out, and I agree with Mr. Larose. Under normal circumstances in these cases if parents cooperate, at least they are allowed to see their children, and much more often than one hour a month. I just think there has been neglect or abuse on the part of the State in handling this case. But I think that — and I know I am speaking now with forked tongue because I am contradicting myself when I say that they didn’t *888 prove their case, but I am going to grant it to them anyway because of the children.
I would like to address one thing that Mr. Larose brought up, and that was about the problems of attorneys practicing in the Juvenile Court with the Department, that once children are removed it is difficult to get them returned. You can address this by contacting Dr. Shwery who is on a committee to study the Department of Health and Human Resources in its dealings with children. He may be interested in hearing from you.
Again, as I say, the State did not prove its case, but pretermitting that I just think that it is in the best interest of these children that they be freed for adoption. I just think that there was injustice done, and I can’t undo that. It is a sad situation; it is an unfortunate situation that this case had to come about the way it did. Thank you.
MR. LAROSE:
I would like to notify the Court of our intent to appeal this decision.
THE COURT:
Submit to the Court a written motion within fifteen days.
JUDGMENT RENDERED in Juvenile Court on the 2nd day of October, 1985.
JUDGEMENT READ AND SIGNED in Juvenile Court on the_day of October, 1985.
Salvadore T. Mule’, Judge”
STM/mh
We note that the trial court judge never signed the written reasons for judgment. Accordingly, we do not know if he changed his mind prior to the rendition of his final judgment. There exists substantial case-law holding that where there is a variance between the written reasons for judgment and the judgment itself, the judgment is controlling. This jurisprudential rule is based on the theory that the trial judge, upon further reflection or research, and prior to rendition of judgment, is allowed the option of changing his factual and/or legal determinations. Thus it may well be that appellant’s specification of error, which is based upon the trial court’s written reasons for judgment, is moot because the trial court judge reconsidered his initial reaction.
If the issue is not moot, however, then we find that the court below is manifestly erroneous in its determination that the State failed to carry its burden of proof by “clear and convincing” evidence. Upon our independant evaluation of the testimony and evidence before us, we find that the State carried its burden of proof and that the trial court did not err in the final judgment rendered which terminated parental rights.
For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.

. In contrast, Mrs. Lyons’ brief states that the neglect hearing judge told her that if she followed the directives of D.H.H.R., her children would be returned to her and D.H.H.R. told her to undergo treatment at the Desire Mental Health Clinic and visit her children. Counsel for Mrs. Lyons contends that all she had to do was show up for the treatments and visits, and that the success or failure of treatment, along with Mrs. Lyons’ current mental health and ability to care for her children, is irrelevant. We obviously cannot agree with this argument. ‘‘Perfect attendance” is not the sole legal criteria.